IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOUISIANA PACIFIC CORPORATION,<br><br>    Plaintiff,<br><br>v.<br><br>MONEY MARKET 1 INSTITUTIONAL INVESTMENT DEALER, ET AL.,<br><br>    Defendants.<br>_____/ | No. C 09-03529 JSW<br><br>**ORDER ON PENDING MOTIONS** |

This matter comes before the Court upon consideration of the motion to dismiss and the motion to strike filed by Defendant Deutsche Bank Securities Inc. ("DBSI") as well as the motion to dismiss and the motion to strike filed by Defendant Money Market 1 Institutional Investment Dealer ("MM1"). Having considered the parties' papers, relevant legal authority, and the record in this case, the Court HEREBY GRANTS DBSI's motion to dismiss, DENIES IN PART and GRANTS IN PART DBSI's motion to strike, DENIES MM1's motion to dismiss, and DENIES MM1's motion to strike.

**BACKGROUND**

**A.     Procedural History.**

This case is one of the many cases that have been filed around the country in the wake of the collapse of the Auction Rate Securities ("ARS") market in February 2008. On July 31, 2009, LP filed this action against its investment advisor, MM1, as well DBSI, the issuing bank, and Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated

(collectively, the "Merrill Lynch Defendants"). On February 10, 2009, the Merrill Lynch Defendants filed a motion before the Judicial Panel on Multidistrict Litigation (the "MDL Panel") in the United States District Court for the Southern District of New York for transfer.

On December 1, 2009, the MDL Panel issued an order transferring the portion of the case relating to the Merrill Lynch Defendants and simultaneously remanded the remaining claims with respect to DBSI's ARS to this Court.[1] Thereafter, DBSI moved to transfer this action to the Southern District of New York. On March 22, 2010, this Court denied the motion to transfer.

In its first amended complaint, LP alleges against DBSI: (1) violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rules 10b-5(a)-(c), promulgated thereunder, 17 C.F.R. § 240.10b-5(a)-(c) (Count IV); (2) violation of California Corporate Securities Law of 1968, Code §§ 25500 and 25501 (Count VIII); and, (3) common law fraud (Count XI).

LP alleges against MM1: (1) violations of Section 10(b) of the Exchange Act and Securities and Exchange Commission Rules promulgated thereunder (Count I); (2) violation of California Corporate Securities Law of 1968, Code §§ 25500, 25501 and 25504.1 (Count V); (3) common law fraud (Count IX); (4) common law negligent misrepresentation (Count XII); and, (5) common law breach of fiduciary duty (Count XIII).

**B.   Factual Background.**

   **1.   Auction Rate Securities.**

ARS are "long-term or perpetual equity or debt instrument that pay interest or dividends at rates set through periodic Dutch auctions." (First Amended Complaint ("FAC") at ¶ 21.) ARS are typically issued by states, municipalities, and state agencies, student loan originators and lenders, and closed-end preferred funds. (*Id.* at ¶ 22.) By February 2008, the market exceeded $330 billion. (*Id.*)

---

[1] Accordingly, Counts II, III, VI, VII, and X, alleged only against the Merrill Lynch Defendants are no longer at issue in this matter.

2

ARS typically trade at par value through periodic Dutch auctions generally held every 7, 28, or 35 days. (*Id.* at ¶ 21.) At each periodic auction, existing holders of ARS can either place an order to sell their securities, hold their securities at whatever rate is established through the Dutch auction, or hold the securities provided that the clearing rate for the auction is at or above a specific level. (*Id.* at ¶ 24.) In the Dutch auction, buy orders are filled beginning from the lowest specified interest rate until all securities available for sale are matched with purchase orders. (*Id.* at ¶ 25.) The rate at which the final sell order is filled is known as the "clearing rate," which then applies to the entire issue of ARS. (*Id.*) In the event there are more sell orders than buy orders, the auction fails and investors seeking to sell their securities are forced to hold onto them, rendering their investment illiquid. (*Id.* at ¶ 26.)

### 2. DBSI's Conduct and the Collapse of the ARS Market.

Investment banks like DBSI underwrote ARS on behalf of issuers, which resulted in lucrative banking fees. (*Id.* at ¶ 27.) DBSI also served as participating broker-dealers for the periodic auctions, generating revenue for each unit of the ARS that they succeeded in placing. (*Id.* at ¶ 28.) The banks also functioned as "market makers for auction rate securities by placing 'support bids' in every auction. In every auction for which they served as the sole broker-dealer, Merrill Lynch and Deutsche Bank would place bids for the full amount of the auction, ... thereby ensur[ing] that auctions would clear, creating the artificial appearance of a liquid and efficient market by injecting false information into the marketplace about the nature and extent of demand for auction rate securities." (*Id.* at ¶ 29.)

Plaintiff alleges that the New York Attorney General concluded that DBSI had a policy of placing support bids in every auction in which it served as sole or lead broker-dealer. (*Id.* at ¶ 30.) When the participating broker-dealers stopped submitting support bids, the market for ARS collapsed. (*Id.* at ¶ 32.)

In May 2006, the Securities and Exchange Commission ("SEC") initiated cease and desist proceedings against 15 investment backs, not including DBSI, that participated in a certain segment of the ARS market. (*Id.* at ¶ 34.) The SEC found that the participating banks had willfully violated Section 17(a)(2) of the Securities Act of 1933 which prohibits the offer or

3

sale of securities by means of any material misstatements and omissions, by intervening in auctions by bidding for their proprietary accounts or asking customers to make or change orders without adequate disclosures.  (*Id*.)  Each of the settling banks, including Merrill Lynch, but not including DBSI, entered into an agreement with the SEC pursuant to which they agreed to provide all purchasers a written description of the banks' material auction practices and procedures.  (*Id.* at ¶ 35.)

In January 2007, the SEC initiated cease and desist proceedings against three banks, including an affiliate of DBSI, Deutsche Bank Trust Company Americas, and found similar violations.  (*Id.* at ¶ 37.)  As a result, Deutsche Bank Trust Company Americas entered into a settlement agreement with the SEC in which it agreed to provide a written description of its ARS practices for auctions to broker-dealers and issuers of each auction and to pay a penalty.  (*Id.*)

On February 19, 2008, in response to a larger collapse in the ARS market, the Municipal Securities Rulemaking Board issued a notice to remind brokers and dealers of disclosure requirements.  (*Id*. at ¶ 40.)  On March 14, 2008, the SEC issued a no-action letter concerning ARS indicating that broker-dealers could avoid liability only by disclosing detailed information for ARS auctions, including the amount of securities for sale, the number and aggregate dollar amount of bids made, the number of bidders, and the number, interest rates and amount of bids, if any, made by the participating dealers.  (*Id.* at ¶ 41.)  Plaintiff alleges that DBSI and MM1 failed to abide by any of these guidelines or best practices and, despite placing support bids in every auction, never disclosed the "true nature or extent of its market manipulation."  (*Id.* at ¶ 42.)

Plaintiff alleges that DBSI served as sole broker-dealer, underwrote, and earned high commissions underwriting ARS, even as the credit markets were deteriorating.  (*Id.* at ¶¶ 91-93.)  DBSI created three derivative backed ARS issued by three trusts, known as the Camber Master Trust, the Pivot Master Trust, and the Capstan Master Trust.  (*Id.* at ¶ 94.)  By structuring them as ARS, DBSI was able to market the Trusts as short-term, liquid notes, rather than fixed-income notes with longer term maturity rates.  (*Id.* at ¶ 102.)  Although DBSI knew

4

there was no liquid market for ARS, Plaintiff alleges, as sole broker-dealer, it "placed support bids for the full amount of the issue in 100 percent of these auctions, and knew that the auctions routinely would have failed in the absence of support bids." (*Id.* at ¶¶ 104-05.) DBSI's Private Placement Memoranda state that "Broker-Dealers may submit Orders and purchase certificates for their own account." (*Id.* at ¶ 106, App. A-2; DBSI RJN, Ex. 1 at 11, Ex. 2 at 11.) The Memoranda also indicate that the auctions may fail and holders may not be able to sell any or all of their certificates and disclose that a secondary market for the certificates may not develop, rendering the investments illiquid. (*See id.* at ¶ 107; DBSI RJN, Ex. 1 at 9, 11.)

### 3. MM1 Participation.

Plaintiff LP is a supplier and distributor of building products throughout the United States and has maintained significant working capital accounts that it uses to fund it ongoing operations. (FAC at ¶ 1.) Plaintiff restricted its working capital to what it understood to be the most safe and liquid investments, including money market instruments and other short-term cash equivalents. (*Id.*) Plaintiff hired MM1 as its financial advisor and broker-dealer and relied upon its representations that ARS were highly liquid and safe cash equivalents, which posed virtually no risk of principal loss. (*Id.* at ¶ 2.) Over time, in reliance upon MM1's advice and recommendations, LP invested more than $300 million of its working capital with MM1 to invest in ARS. (*Id.*) Plaintiff specifically alleges that representatives of MM1 affirmatively represented that the ARS were safe and liquid cash equivalents and were analogous to money market instruments. (*See e.g.,* FAC at ¶¶ 2-7, 9, 128-133, 136-38, 142, 148-151.)

The Court shall address specific additional facts in the remainder of this Order.

## ANALYSIS

### A. Applicable Legal Standards for Motion to Dismiss.

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. The complaint is construed in the light most favorable to the non-moving party and all material allegations in the complaint are taken to be true. *Sanders v. Kennedy,* 794 F.2d 478, 481 (9th Cir. 1986). The Court may consider the facts alleged in the complaint, documents attached to the complaint, documents

5

1 relied upon but not attached to the complaint, when the authenticity of those documents is not
2 questioned, and other matters of which the Court can take judicial notice. *Zucco Partners LLC*
3 *v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

Federal Rule of Civil Procedure 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Even under Rule 8(a)'s liberal pleading standard, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Pursuant to *Twombly*, a plaintiff must not merely allege conduct that is conceivable but must instead allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. ... When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 556-57) (internal quotation marks omitted).

Where a plaintiff alleges fraud, however, Federal Rule of Civil Procedure 9(b) requires the plaintiff to state with particularity the circumstances constituting fraud, including the "who, what, when, where, and how" of the charged misconduct. *See Vess v. Ciba Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir. 2003); *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547-49 (9th Cir. 1994). In the securities context, the pleading requirements are even more stringent.

**B.     Private Securities Litigation Reform Act ("PSLRA").**

"At the pleading stage, a complaint stating claims under section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of ... Rule 9(b) and the PSLRA." *Zucco Partners*, 552 F.3d at 990. The PSLRA requires that "a complaint 'plead with particularity both falsity

6

and scienter.'" *Id.* (quoting *Gompper v. VISX*, 298 F.3d 893, 895 (9th Cir. 2002), in turn quoting *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)).

Under the PSLRA, actions based on allegations of material misstatements or omissions must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1). In order to adequately plead scienter, the PSLRA requires that the plaintiff "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Zucco Partners*, 552 F.3d at 991 (quoting 15 U.S.C. § 78u-4(b)(2)). If the allegations are insufficient to state a claim, a court should grant leave to amend, "unless it is clear that the complaint could not be saved by any amendment." *Id.* at 989 (quoting *Livid Holdings, Ltd. v. Solomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005)).

**C.     Requests for Judicial Notice.**

A court may take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

DBSI and MM1 ask that the Court take judicial notice of, *inter alia*, offering memoranda for the ARS and an order issued in 2006 by the SEC. (DBSI Request for Judicial Notice ("RJN"), Exs. 1-3, A; MM1 RJN, Exs. 13-17.) Because these documents either are referenced in the complaint or are publicly available information, they are the proper subject of judicial notice. *See* Fed. R. Evid. 201(b). Accordingly, the Court grants DBSI's request for judicial notice as to these exhibits.

DBSI and MM1 also ask the Court to take judicial notice of news articles and public reports regarding ARS, which DBSI submits as Exhibits B through K and MM1 submits in connection with its request for judicial notice as Exhibits 9 through 13. Plaintiff objects to

7

these requests. Because the Court did not rely on these documents to resolve this motion, the requests for judicial notice of these documents are denied as moot.

**D.  Motion to Dismiss Filed By Deutsche Bank Securities Inc.**

   **1.  Claim for Violations of Section 10(b) of the Exchange Act is Dismissed With Leave to Amend.**

   **a.  Manipulative Acts.**

To plead a claim based on market manipulation, a plaintiff must allege, *inter alia*, that the defendant engaged in manipulative acts, that the plaintiff suffered damage, which was caused by his or her reliance on an assumption that the market was free of manipulation, and that the defendant acted with scienter. *See, e.g., ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007). A claim for market manipulation is subject to Rule 9(b)'s heightened pleading standards, but, because it "can involve facts solely within the defendant's knowledge ... at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *Id.* at 102.

DBSI moves to dismiss Plaintiff's market manipulation claims on the basis that Plaintiff fails to allege facts supporting each of the elements of its claim and fail to satisfy the pleading requirements under Federal Rule of Civil Procedure 9(b).

Plaintiff alleges that DBSI manipulated the market by: (1) placing support bids for the entire notional amount of the securities in every auction for which it was the sole or lead broker-dealer to prevent auction failures and (2) systematically intervening in auctions to set the clearing rate.[2] "Manipulation is virtually a term of art when used in connection with securities markets." *Santa Fe Indus. v. Green*, 430 U.S. 462, 476 (1977) (internal quotations and citations omitted). In essence, the term "'connotes intentional or willful conduct designed to deceive or

---

[2] Broker-dealers are not barred from participating in auctions. Indeed, the SEC investigated the auction practices of other auction dealers, and it issued an Order Instituting Administrative and Cease-And-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and A Cease-And-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934 (the "Broker-Dealer Order"). In that order, the SEC stated that broker-dealers are not prohibited from bidding for their proprietary accounts "when properly disclosed." (DBSI RJN, Ex. A (Broker-Dealer Order at 6 n. 6).)

8

defraud investors by controlling or artificially affecting the price of securities.'" *ATSI*, 493 F.3d at 100 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)).

Deception arises when an investor is erroneously lead to believe that the prices for the security in question are driven by the "'natural interplay of supply and demand, not rigged by manipulators.'" *Id.* (quoting *Gurary v. Winehouse*, 193 F.3d 37, 45 (2d Cir. 1999)). "[N]ondisclosure is usually essential to the success of a manipulative scheme." *Santa Fe*, 430 U.S. at 477; *see also In re UBS Auction Rate Sec. Litig.*, No. 08 Civ. 2967 (LMM), 2010 WL 2541166, at *17 (S.D.N.Y. June 24, 2010) ("*UBS*"). Thus, "[t]he market is not mislead when a transaction's terms are fully disclosed." *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 390 (S.D.N.Y. 2010) ("*Merrill Lynch*").

Recently, courts in other districts have dismissed similar market manipulation claims on the basis that the defendants in those cases disclosed the allegedly manipulative conduct. For example, in the *UBS* case, the defendants disclosed in prospectuses that they placed support bids in auctions and also disclosed that they had an advantage when doing do, because they had access to certain information when placing those bids. *UBS*, 2010 WL 2541166, at *17-18. In light of those facts, the court concluded that plaintiffs could not have been deceived, because the "documents disclosed that the ARS market was not necessarily set by the 'natural interplay of supply and demand,' but that it could be influenced by broker dealers." *Id.*, at *18.

In the *Merrill Lynch* case, the court concluded that plaintiffs had not sufficiently alleged that the defendant "sent a false pricing signal to the market." 704 F. Supp. 2d at 391. The court noted that Merrill Lynch, in response to the Broker-Dealer Order, posted a disclosure document on its website that it was permitted, but not obligated, to submit orders in auctions for its own account and routinely did so in its sole discretion. *Id.* at 385-86. Merrill Lynch also disclosed: the advantages it might have over other bidders as a result of this practice; that when it was the sole auction dealer, it could discern the clearing rate before orders were submitted and could set the clearing rate with its order; that it was not obligated to continue to place bids; and that investors should not assume it would continue to place bids or that auction failures would not occur. *Id.* at 386. Merrill Lynch prospectuses included similar disclosures. *Id.* at 386-87.

9

The court concluded that these disclosures "negate the Plaintiffs' claims that Merrill Lynch misled the market into believing that the price of the securities and the clearing rates set by the auctions were dictated by the natural interplay of supply and demand." *Id.* at 392. The court also rejected the plaintiffs' argument that because Merrill Lynch "systematically," rather than "routinely," submitted support bids, the disclosures were inadequate. The court also found that the defendants adequately "disclosed that the lack of auction failures was not indicative of the health of the ARS market." *Id.* at 392-93. "These disclosures, issued in the wake of the [Broker-Dealer Order] preclude the plaintiffs from pleading manipulative acts as a matter of law." *Id.* at 393; *see also In re Merrill Lynch Auction Rate Sec. Litig.*, 09-MD-2030 (LAP), 2011 WL 536437, at \*6 (S.D.N.Y. Feb. 9, 2011).

However, the Court finds that Plaintiff's allegations in this case are distinguishable from the plaintiffs' allegations in the *UBS* and *Merrill Lynch* cases. DBSI disclosed that in any auction it may submit orders and purchase certificates for their own account and that, as a result of these practices, DBSI was likely to have an advantage over other potential or existing holders in that it would have knowledge of other orders placed through it in the auction, and that DBSI may assist in the resales of certificates but is not required to do so, which may result in the failure of development of a secondary market. (*See* FAC App. A-2; DBSI RJN, Ex. 1 at 9, 11, Ex. 2 at 11.) Unlike the plaintiffs in *UBS*, Plaintiff here does allege that DBSI "placed support bids for the full amount of the issue in 100 percent of these auctions, and knew that the auctions routinely would have failed in the absence of support bids." (*Id.* at ¶ 105.)

The fact that the disclosures here did not reveal routine bids or link the broker-dealer's active and consistent participation in the market with its lack of failure, distinguishes this case from *UBS*. The language DBSI used in its disclosures does not reveal that "the ARS market was not necessarily set by the 'natural interplay of supply and demand,' but ... could be influenced by broker dealers." *UBS*, 2010 WL 2541166 at \*18; *see also Merrill Lynch*, 704 F. Supp. 2d at 392-93 (and rejecting plaintiffs' argument that disclosures were insufficient as "unavailing"). Likewise, in *Merrill Lynch*, the Court dismissed the market manipulation claim where defendants had disclosed not just that they "may" participate in ARS auction, but that

10

they "routinely" did. *Merrill Lynch*, 704 F. Supp. 2d at 392; *see also In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 304 (S.D.N.Y. 2009) (noting that defendant's disclosures informed investors that defendant "routinely" participated in auctions in order to avoid failure); *see also In re Bank of America Corp.*, 2011 WL 740902, at *3, 8 (N.D. Cal. Feb. 24, 2011) (finding essential that the disclosures included the representation that the bank "routinely" submitted orders and the link that the orders might be designed to prevent future auction failures); *see also The Anshultz Corp. v. Merrill Lynch and Co.*, C 09-03780 SI (Order dated March 27, 2011 at 12-13) (same).

Because the disclosures in this case indicate only that DBSI "may" participate in the auctions and did not disclose any connection between DBSI's routine participation in every single auction in order to avoid failure and to set a specific clearing rate, the Court finds the disclosures alleged to be insufficient. Accordingly, the Court finds that Plaintiff has stated sufficient facts to support this portion of its market manipulation claim under Section 10(b) based on DBSI's placement of support bids or based on the impact DBSI could have on the clearing rate.

However, the Court finds that Plaintiff has failed to allege facts sufficient to satisfy either the scienter or the reliance requirements of its claim against DBSI.

### b. Scienter.

"To adequately demonstrate that the 'defendant acted with the required state of mind,' a complaint must 'allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness.'" *Zucco Partners*, 552 F.3d at 991 (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014-15 (9th Cir. 2005)). The Ninth Circuit recently clarified that a court should "conduct a dual inquiry," when it evaluates allegations of scienter. *Id.* at 991-92. First, a court should determine "whether any of the plaintiff's allegations, standing alone are sufficient to create a strong inference of scienter." *Id.* at 992. Second, "if no individual allegations are sufficient," a court should "conduct a 'holistic' review of the same allegations to determine whether the individual allegations combine to create a strong inference

11

of intentional conduct or deliberate recklessness." *Id.*; *accord Sicracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1180 (9th Cir. 2009).

"'[I]n determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences.'" *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007)). A plaintiff sufficiently alleges scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The inquiry "is inherently comparative." *Id.* "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco Partners*, 552 F.3d 991 (citing *Tellabs*, 551 U.S. at 324).

Plaintiff claims that DBSI acted with scienter based on the allegation that DBSI earned lucrative fees and commissions in connection with its role in the ARS market. (*See* FAC ¶ 204.) The desire to earn commissions or fees is a common motive to all for profit enterprises, and that motive - without more - is insufficient to give rise to a strong inference of scienter. *See, e.g., Dow Corning Corp. v. BB&T Corp.*, No. 09-5637 (FSH) (PS), 2010 U.S. Dist. LEXIS 124031, at *26 (D.N.J. Nov. 23, 2010); *Vining v. Oppenheimer Holdings, Inc.*, No. 08 Civ. 4435 (LAP), 2010 WL 3825722, at *7 (S.D.N.Y. Sept. 29, 2010); *In re Citigroup*, 700 F. Supp. 2d at 30; *Defer v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 217 (S.D.N.Y. 2009) ("*Defer I*").

Although the Court finds the current allegations of scienter to be insufficient, because it is not clear that Plaintiff could not cure the deficiency, the Court will grant leave to amend.[3]

---

[3] The Court notes that DBSI has not come forward with a legitimate explanation for its conduct to rebut Plaintiff's allegations of scienter, but still finds that the desire to earn lucrative fees, standing alone, appears to be insufficient. *See Telltabs*, 551 U.S. at 326 (recognizing that courts may engage in "comparative assessments of plausible inferences" of scienter as long as they "constantly assum[e] the plaintiff's allegations to be true.")

12

#### c. Justifiable Reliance.

Damage caused by reasonable reliance "on an assumption efficient market free of manipulation," is an essential element of a market manipulation claim. *ATSI*, 493 F.3d at 101; *see also Merrill Lynch*, 704 F. Supp. 2d at 393. Plaintiff claims only to have relied on the advice of their investment advisors, MM1, and not on the representations made by DBSI. (*See, e.g.,* FAC at ¶¶ 2-5, 9, 130, 133, 139-142, 148-151.) Plaintiff has not alleged that it reviewed, read, or relied upon any of DBSI's disclosures directly.[4] Accordingly, Plaintiff has failed to allege sufficient facts to establish reliance against DBSI. *See, e.g., Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999) (requiring justifiable reliance to state a claim under Section 10(b)).[5] Although the Court finds the current allegations of reliance to be insufficient, because it is not clear that Plaintiff could not cure the deficiency, the Court will grant leave to amend.

Because Plaintiff has not alleged sufficient facts to demonstrate either scienter or justifiable reliance, the Court GRANTS DBSI's motion to dismiss its Section 10(b) claim with leave to amend.

### 2. Claim for Violations of California Corporations Code is Dismissed.

Based on the same set of operative facts, Plaintiff also alleges that DBSI violated California Corporations Code sections 25500 and 25501 which prohibits misrepresentation and

---

[4] Plaintiff does allege that it would not have purchased the securities had it been aware of their true risk, value, and liquidity and that it relied on the appearance of liquidity create by DBSI in the market. (FAC at ¶ 117.) However, that allegation, standing alone, is insufficient to meet the reliance requirement for an independent cause of action against DBSI where the gravamen of the complaint is based on Plaintiff's direct reliance on its investment advisor, MM1.

[5] To the extent Plaintiffs rely upon the presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972), such reliance is misplaced. (*See* Opp. Br. at 25-26.) Such reliance is "limited to cases that 'can be characterized as ... primarily alleg[ing] omissions.'" *Desai v. Deutsche Bank Securities Ltd.*, 573 F.3d 931, 940 (9th Cir. 2009). In *Desai*, the Ninth Circuit noted that, "[i]n order to succeed, manipulative schemes must usually remain undisclosed to the general public. ... If such nondisclosure of a defendant's fraud was an actionable omission, then every manipulative conduct case would become an omissions case." *Id*. at 941. As such, the court concluded that the *Affiliated Ute* presumption is not available when a plaintiff alleges "some omissions, but also misrepresentations and secret manipulation." *Id.* Because the Court finds that Plaintiff's omissions allegations are not separable from the manipulative conduct, the Court concludes that Plaintiff cannot rely on the *Affiliated Ute* presumption to establish reliance here.

1  market manipulation in the sale of securities. The claim, as currently stated, is flawed because
2  Plaintiff fails to allege strict contractual privity in the purchase of the subject securities.[6] *See*
3  *SEC v. Seaboard Corp.*, 677 F.2d 1289, 1296 (9th Cir. 1982).

4  Regardless, however, Plaintiff's claims under the California Corporations Code fail
5  because, for the same reasons Plaintiff fails to allege scienter with regard to the Section 10(b)
6  claim, this claim does not include sufficient facts to support scienter under California law.
7  Section 25500 of the Corporations Code provides that "[a]ny person who willfully participates
8  in any act or transaction in violation of Section 25400 shall be liable to any other person who
9  purchases or sells any security at a price which was affected by such act or transaction for
10 damages sustained by the latter as a result of such act or transaction." Cal. Corp. Code § 25500.
11 Plaintiff fails to allege facts sufficient to demonstrate such willful participation, but shall be
12 given leave to amend to address the insufficiencies in pleading.

### 3. Claim for Common Law Fraud is Dismissed.

14 To allege a claim for common law fraud under California law, Plaintiff must prove: (1)
15 misrepresentation, either false representation, concealment, or nondisclosure; (2) knowledge of
16 the falsity; (3) intent to defraud; (4) justifiable reliance; and (5) resulting damage. *Seeger v.*
17 *Odell*, 18 Cal. 2d 409, 414 (1941). As already addressed, Plaintiff fails to allege scienter or
18 justifiable reliance. For all of the same reasons, therefore, this claim also fails, but Plaintiff is
19 given leave to amend.[7]

---

[6] Plaintiff alleges that it invested "through Money Market One in [the ARS] market." (FAC at ¶ 139.) Thus, as currently pled, a cause of action lies against MM1, not DBSI.

[7] The Court GRANTS the administrative request to consolidate the motion to strike arguments and DENIES IN PART and GRANTS IN PART DBSI's motion to strike. (Docket nos. 123 and 94.) The allegations regarding regulatory investigations are pertinent to the factual background of the case, but Plaintiff's claim for punitive damages is associated with the California common law count for fraud. *See* Fed. R. Civ. P. 12(f). Motions to strike are regarded with disfavor because they are often used as delaying tactics and because of the limited importance of pleadings in federal practice. *Colaprico v. Sun Microsystems Inc.*, 758 F. Supp. 1335, 1339 (N.D. Cal. 1991). "[M]otions to strike should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *Id*. Ultimately, the decision as to whether to strike allegations is a matter within the Court's discretion. *Id*. Should Plaintiff elect to amend the complaint and allege a proper claim for common law fraud, it may attempt to allege sufficient facts to warrant a possible award of punitive damages.

14

**E.     Motion to Dismiss Filed by Money Market One.**

MM1 acted as Plaintiff's investment broker and fiduciary and, according to the complaint, was familiar with the conservative investment guidelines governing Plaintiff's working capital account, which restricted all investments to short-term, safe and liquid cash-equivalent securities. Plaintiff alleges that it invested in the risky ARS based on MM1's misrepresentations about the nature of the investments and false assurances that they were safe cash equivalents that met Plaintiff's needs. (*See e.g.,* FAC at ¶¶ 2-7, 9, 128-133, 136-38, 142, 148-151.) Plaintiff alleges that MM1 was aware that DBSI placed support bids in "nearly every auction," and that there was no liquid market for ARS and that the appearance of a market was "entirely dependent upon broker-dealer participation," but failed to disclose these facts to Plaintiff. (*See id.* at ¶ 133.) Plaintiff further alleges that, in return for acquiring institutional investors such as Plaintiff, MM1 received substantial commission payments from the defendant banks. (*Id.* at ¶ 7.)

In its motion to dismiss, MM1 essentially recites the elements of the claims pending against them, followed by a conclusory declaration that Plaintiff failed to plead the required elements. Plaintiff is correct in its assessment that "[t]his method of briefing ... offers no discernable benefit to the Court." (Opp. Br. at 8.) On this basis alone, the Court finds that MM1 has failed to sustain its burden to demonstrate that the complaint fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6); *see also Rimes v. Noteware Development LLC*, 2010 WL 1644693, * 2 (N.D. Cal. Apr. 21, 2010) (holding that the arguments in a motion to dismiss were wholly conclusory and citing cases to the effect that issues not sufficiently argued in the briefs or averred in a perfunctory manner, unaccompanied by some effort at developed argument, are considered waived). The Court finds the arguments in MM1's moving papers wholly perfunctory and without discernable benefit to the Court.

Regardless, having reviewed the parties' papers, the record, and the relevant legal authority, the Court denies MM1's motion to dismiss on the merits. Plaintiff has stated a suitability claim under Section 10(b) by alleging that the securities it purchased on MM1's advice and recommendation were unsuitable and that the misrepresentations and omissions in

15

question related to the suitability of those securities. *See Louros v. Kreicas*, 367 F. Supp. 2d 572, 585 (S.D.N.Y. 2005). According to the plain and numerous allegations in the complaint, MM1 failed to disclose that the complicated structured investments fell outside of the scope of LP's investment guidelines. *See e.g., Defer I*, 654 F. Supp. 2d at 212 (holding that had Plaintiff named its investment advisor as a defendant, the court would have found similar allegations of misrepresentations sufficient to state a claim under Section 10(b)).

The Court also finds that LP has adequately pled its state law causes of action against MM1 and that the law of California, which has a substantial interest in the outcome of the claim, applies. Based on the same alleged conduct underlying the Section 10(b) claim, Plaintiff's allegations are sufficient to state claims for breach of fiduciary duty, common law fraud, negligent misrepresentation, and violations of California's Blue Sky Laws. The extent to which MM1, as an investment broker and fiduciary, and not LP, a sophisticated institutional investor, is responsible for understanding the inherent risks associated with the ARS investments is a question of fact, not appropriate for resolution at this procedural stage. Accordingly, the Court DENIES MM1's motion to dismiss.[8]

## CONCLUSION

For each of the foregoing reasons, the Court holds as follows: (1) DBSI's motion to dismiss is GRANTED WITH LEAVE TO AMEND (docket no. 91); (2) DBSI's motion to strike is DENIED IN PART and GRANTED IN PART (docket No. 94); (3) MM1's motion to dismiss is DENIED (docket no. 95); (4) MM1's motion to strike is DENIED (docket no. 98); (5) Plaintiff's three motions to file supplemental material and authority are GRANTED (docket nos. 121, 129, 131); (6) DBSI's motion for leave to file statement of recent decision is GRANTED (docket no. 128); and (7) DBSI's motion to consolidate the motion to strike is GRANTED (docket no. 123).

---

[8] MM1 moves under Federal Rule of Civil Procedure 12(f) to strike Plaintiff's prayer for punitive damages. MM1 argues that punitive damages are unrecoverable as a matter of law because Plaintiff has failed to plead a claim that alleges malice, fraud, or oppression. *See e.g., Stevens v. Superior Court*, 180 Cal. App. 3d 605, 610 (1986). Because the Court has denied the motion to dismiss Plaintiff's claim for common law fraud, MM1's motion to strike is DENIED.

16

Because the Court cannot say that Plaintiff could not remedy the defects in pleading alleged herein, the Court shall permit Plaintiff the opportunity to amend the complaint. If Plaintiff wishes to file a second amended complaint as against DBSI, it shall do so by no later than April 29, 2011.[9] If Plaintiff choose to stand on the allegations as set forth in the first amended complaint, it shall file a notice to that effect by no later than April 29, 2011. Upon receipt of such notice, the Court shall enter a final judgment as to DBSI dismissing the claims with prejudice.

**IT IS SO ORDERED.**

Dated: March 28, 2011

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

---

[9] Such an amendment shall have no effect on the Court's ruling regarding MM1's liability.

17