**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

# UNITED STATES  DISTRICT COURT

## Northern District of California

San Francisco Division

LOUISIANA PACIFIC CORPORATION,

Plaintiff,

v.

MONEY MARKET 1 INSTITUTIONAL
INVESTMENT DEALER, et al.,

Defendants.

_____/

No. C 09-03529 JSW (LB)

**ORDER REGARDING (1) LP AND
DBSI'S TWO JOINT DISCOVERY
DISPUTE LETTERS DATED AUGUST
9, 2012, (2) LP AND DBSI'S JOINT
DISCOVERY DISPUTE LETTER
DATED SEPTEMBER 6, 2012, AND (3)
DBSI'S TWO ADMINISTRATIVE
MOTIONS FOR LEAVE TO FILE
PORTIONS OF THE AUGUST 9, 2012
LETTERS UNDER SEAL**

## I.  INTRODUCTION

Plaintiff Louisiana Pacific Corporation ("LP" or "Plaintiff") sued Money Market 1 Institutional

Investment Dealer ("MM1"), Merrill Lynch & Co., Inc., Merrill Lynch Pierce Fenner & Smith

Incorporated (collectively, the "Merrill Lynch Defendants"), and Deutsche Bank Securities, Inc.

("DBSI") for violating federal and state securities laws.  The Judicial Panel on Multidistrict

Litigation transferred LP's claims against the Merrill Lynch Defendants to the United States District

Court for the Southern District of New York, leaving only LP's claims against MM1 and DBSI in

this district.

On August 22, 2012, Judge White, the presiding judge in the case, referred two joint discovery

dispute letters submitted by LP and DBSI to this court for resolution.  And on September 6, 2012,

LP and DBSI filed a third joint discovery dispute letter. Pursuant to Civil Local Rule 7-1(b), the court finds these matters suitable for determination without oral argument. Upon consideration of the parties' joint letters and the applicable authority, the court rules as follows.

## II.  BACKGROUND

### A.  Factual Background

In a previous order, issued on March 28, 2011, Judge White summarized the relevant factual background for this case. Although Judge White's summary was based on LP's First Amended Complaint, which is no longer operative[1], the court finds his summary to be both sufficient and appropriate for understanding the context of the current discovery disputes. Thus, as Judge White explained in relevant part:

**B. Factual Background.**

**1. Auction Rate Securities.**

[Auction Rate Securities ("ARS")] are "long-term or perpetual equity or debt instrument that pay interest or dividends at rates set through periodic Dutch auctions." (First Amended Complaint ("FAC") at ¶ 21.) ARS are typically issued by states, municipalities, and state agencies, student loan originators and lenders, and closed-end preferred funds. (*Id*. at ¶ 22.) By February 2008, the market exceeded $330 billion. (*Id*.)

ARS typically trade at par value through periodic Dutch auctions generally held every 7, 28, or 35 days. (*Id*. at ¶ 21.) At each periodic auction, existing holders of ARS can either place an order to sell their securities, hold their securities at whatever rate is established through the Dutch auction, or hold the securities provided that the clearing rate for the auction is at or above a specific level. (*Id*. at ¶ 24.) In the Dutch auction, buy orders are filled beginning from the lowest specified interest rate until all securities available for sale are matched with purchase orders. (*Id*. at ¶ 25.) The rate at which the final sell order is filled is known as the "clearing rate," which then applies to the entire issue of ARS. (*Id*.) In the event there are more sell orders than buy orders, the auction fails and investors seeking to sell their securities are forced to hold onto them, rendering their investment illiquid. (*Id*. at ¶ 26.)

**2. DBSI's Conduct and the Collapse of the ARS Market.**

Investment banks like DBSI underwrote ARS on behalf of issuers, which resulted in lucrative banking fees. (*Id*. at ¶ 27.) DBSI also served as participating

---

[1] After Judge White granted DBSI's motion to dismiss LP's First Amended Complaint, 3/28/2012 Order, ECF No. 132, LP filed a Second Amended Complaint that contains "more robust factual allegations," 10/27/2011 Order, ECF No. 165 at 2. *See* Second Amended Complaint ("SAC"), ECF No. 136. Judge White denied DBSI's motion to dismiss LP's Second Amended Complaint on October 27, 2011. *Id*.

broker-dealers for the periodic auctions, generating revenue for each unit of the ARS that they succeeded in placing. (*Id.* at ¶ 28.) The banks also functioned as "market makers for auction rate securities by placing 'support bids' in every auction. In every auction for which they served as the sole broker[-]dealer, Merrill Lynch and Deutsche Bank would place bids for the full amount of the auction, ... thereby ensur[ing] that auctions would clear, creating the artificial appearance of a liquid and efficient market by injecting false information into the marketplace about the nature and extent of demand for auction rate securities." (*Id.* at ¶ 29.)

Plaintiff alleges that the New York Attorney General concluded that DBSI had a policy of placing support bids in every auction in which it served as sole or lead broker-dealer. (*Id.* at ¶ 30.) When the participating broker-dealers stopped submitting support bids, the market for ARS collapsed. (*Id.* at ¶ 32.)

In May 2006, the Securities and Exchange Commission ("SEC") initiated cease and desist proceedings against 15 investment backs, not including DBSI, that participated in a certain segment of the ARS market. (*Id.* at ¶ 34.) The SEC found that the participating banks had willfully violated Section 17(a)(2) of the Securities Act of 1933 which prohibits the offer or sale of securities by means of any material misstatements and omissions, by intervening in auctions by bidding for their proprietary accounts or asking customers to make or change orders without adequate disclosures. (*Id.*) Each of the settling banks, including Merrill Lynch, but not including DBSI, entered into an agreement with the SEC pursuant to which they agreed to provide all purchasers a written description of the banks' material auction practices and procedures. (*Id.* at ¶ 35.)

In January 2007, the SEC initiated cease and desist proceedings against three banks, including an affiliate of DBSI, Deutsche Bank Trust Company Americas, and found similar violations. (*Id.* at ¶ 37.) As a result, Deutsche Bank Trust Company Americas entered into a settlement agreement with the SEC in which it agreed to provide a written description of its ARS practices for auctions to broker-dealers and issuers of each auction and to pay a penalty. (*Id.*)

On February 19, 2008, in response to a larger collapse in the ARS market, the Municipal Securities Rulemaking Board issued a notice to remind brokers and dealers of disclosure requirements. (*Id.* at ¶ 40.) On March 14, 2008, the SEC issued a no-action letter concerning ARS indicating that broker-dealers could avoid liability only by disclosing detailed information for ARS auctions, including the amount of securities for sale, the number and aggregate dollar amount of bids made, the number of bidders, and the number, interest rates and amount of bids, if any, made by the participating dealers. (*Id.* at ¶ 41.) Plaintiff alleges that DBSI and MM1 failed to abide by any of these guidelines or best practices and, despite placing support bids in every auction, never disclosed the "true nature or extent of its market manipulation." (*Id.* at ¶ 42.)

Plaintiff alleges that DBSI served as sole broker-dealer, underwrote, and earned high commissions underwriting ARS, even as the credit markets were deteriorating. (*Id.* at ¶¶ 91-93.) DBSI created three derivative backed ARS issued by three trusts, known as the Camber Master Trust, the Pivot Master Trust, and the Capstan Master Trust. (*Id.* at ¶ 94.) By structuring them as ARS, DBSI was able to market the Trusts as short-term, liquid notes, rather than fixed-income notes with longer term maturity rates. (*Id.* at ¶ 102.) Although DBSI knew there was no liquid market for ARS, Plaintiff alleges, as sole broker-dealer, it "placed support bids for the full amount of the issue in 100 percent of these auctions, and knew that the auctions routinely would have failed in the absence of support bids." (*Id.* at ¶¶ 104-05.) DBSI's Private

1   Placement Memoranda state that "Broker-Dealers may submit Orders and purchase
    certificates for their own account." (*Id.* at ¶ 106, App. A-2; DBSI RJN, Ex. 1 at 11,
2   Ex. 2 at 11.)  The Memoranda also indicate that the auctions may fail and holders
    may not be able to sell any or all of their certificates and disclose that a secondary
3   market for the certificates may not develop, rendering the investments illiquid. (*See
    id.* at ¶ 107; DBSI RJN, Ex. 1 at 9, 11.)

4

5   3/28/2012 Order, ECF No. 132 at 2-5.

6   **B.  Procedural History**

7       As Judge White also noted, this case is one of the many cases that have been filed around the

8   country in the wake of the collapse of the ARS market in February 2008.  3/28/2012 Order, ECF No.

9   132 at 1.  On July 31, 2009, LP filed this action against its investment advisor, MM1, as well DBSI,

10  the issuing bank, and the Merrill Lynch Defendants.  On December 1, 2009, the Judicial Panel on

11  Multidistrict Litigation issued an order transferring LP's claims against the Merrill Lynch

12  Defendants to the United States District Court for the Southern District of New York and

13  simultaneously remanded the remaining claims with respect to DBSI's ARS to this district.

14      LP filed a First Amended Complaint on March 8, 2010.  First Amended Complaint ("FAC"),

15  ECF No. 86.  DBSI moved to dismiss it, and on March 28, 2011, Judge White granted their motion

16  and allowed LP to file an amended complaint.  3/28/2012 Order, ECF No. 132.

17      On May 20, 2011, LP filed its Second Amended Complaint. SAC, ECF No. 136.  In it, LP

18  alleges against DBSI: (1) violations of Section 10(b) of the Securities Exchange Act of 1934 (the

19  "Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rules 10b-5(a)-(c),

20  promulgated thereunder, 17 C.F.R. § 240.10b-5(a)-(c) (Count IV); (2) violations of the California

21  Corporate Securities Law of 1968, Code §§ 25500 and 25501 (Counts VIII and IX); and (3)

22  common law fraud (Count XII).[2]

23      The case is set for trial on June 3, 2013, and fact discovery closes on September 14, 2012.

24  _____

25      [2] Against MM1, LP alleges: (1) violations of Section 10(b) of the Exchange Act and
    Securities and Exchange Commission Rules promulgated thereunder (Count I); (2) violations of
26  California Corporate Securities Law of 1968, Code §§ 25500, 25501 and 25504.1 (Count V);
    (3) common law fraud (Count X); (4) common law negligent misrepresentation (Count XIII);
27  and, (5) common law breach of fiduciary duty (Count XIV).  See SAC, ECF No. 136 at 72-92, ¶¶
    179-265.
28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

6/13/2012 Stipulation and Order, ECF No. 205.  On August 9, 2012, LP and DBSI jointly submitted to Judge White two letters that describe two discovery disputes.[3]  In the first letter, DBSI seeks a protective order that quashes LP's notice of a Rule 30(b)(6) deposition of DBSI.  In the second letter, DBSI challenges LP's chosen confidentiality designations for several of the documents its has produced in this litigation.  And in the third letter, DBSI seeks an order requiring LP to respond to DBSI's "contention interrogatories."  The court addresses each of these disputes in turn below.

### III.  DISCUSSION

**A.  The First Letter: The Parties' Dispute over DBSI's Rule 30(b)(6) Deposition**

**1.  Legal Standard**

Subject to the limitations imposed by subsection (b)(2)(C), under Rule 26, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b)(1).  "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  *Id*.  However, "[o]n motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."  Fed. R. Civ. P. 26(b)(2)(C).

---

[3] LP and DBSI lodged, but not file, these letters with Judge White's chambers.  This is because the parties believe that the letters contain information designated as confidential by either of the parties.  Accordingly, DBSI filed two administrative motions asking for permission to file portions of the letters under seal.  Administration Motion to File under Seal (Deposition Dispute), ECF No. 218; Administrative Motion for File under Seal (Designation Dispute), ECF No. 221.  The court agrees that the portions of the letters that DBSI seeks to file under seal are properly designated as (at least) confidential.  As such, DBSI's two administrative motions are **GRANTED**.  DBSI shall file the letters under seal in accordance with the procedures set forth in Civil Local Rule 79-5 and General Order 62.

UNITED STATES DISTRICT COURT
For the Northern District of California

The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1). *See Soto v. City of Concord*, 162 F.R.D. 603, 610 (N.D. Cal. 1995). In turn, the party opposing discovery has the burden of showing that discovery should not be allowed, and also has the burden of clarifying, explaining and supporting its objections with competent evidence. *See DirectTV, Inc. v. Trone*, 209 F.R.D. 455, 458 (C.D. Cal. 2002).

Rule 30(a)(1) provides that, subject to certain limitations, "[a] party may, by oral questions, depose any person, including a party, without leave of court. . . ." In turn, Rule 30(b)(6) provides that, "[i]n its notice or subpoena, a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination. The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify." Fed. R. Civ. P. 30(b)(6). "The corporation has a duty to educate its witnesses so they are prepared to fully answer the questions posed at the deposition." *Bowoto v. ChevronTexaco Corp.*, No. C 99-02506 SI, 2006 WL 294799, at *1 (N.D. Cal. Feb.7, 2006) (citing *In re Vitamins Antitrust Litig.*, 216 F.R.D. 168, 172 (D.D.C. 2003)).

A party noticing a deposition pursuant to Rule 30(b)(6) must describe with reasonable particularity the matters on which the examination is requested. Fed. R. Civ. P. 30(b)(6). "However, the 'reasonable particularity' requirement of Rule 30(b)(6) cannot be used to limit what is asked of the designated witness at a deposition." *UniRAM Technology, Inc. v. Monolithic Sys. Tech., Inc.*, No. C 04-1268 VRW (MEJ), 2007 WL 915225, at *2 (N.D. Cal. Mar. 23, 2007) (citing *Detoy v. City and County of San Francisco*, 196 F.R.D. 362, 366-67 (N.D. Cal. 2000)). "The 30(b)(6) notice establishes the minimum about which the witness must be prepared to testify, not the maximum." *Id.* (citing *Detoy*, 196 F.R.D. at 366-67).

**2. Analysis**

LP's Rule 30(b)(6) deposition notice seeks testimony from DBSI about 19 topics concerning, more or less, DBSI's structure and record retention policies, the reasons it took certain actions, and

the processes by which it took them.[4]

DBSI makes two arguments against the deposition.  First, it argues that the Rule 30(b)(6) is cumulative of other discovery LP has taken.  It states that, as of August 9, 2012, it has produced millions of pages of documents and has responded to 29 interrogatories.  It also states that LP has taken the depositions of six current or former DBSI employees and will take three more shortly.  It argues that these documents and interrogatory responses, and the individual witnesses' deposition testimony, should satisfy LP's discovery needs with respect to the Rule 30(b)(6) deposition topics.

DBSI takes too narrow of a view of the purpose of a Rule 30(b)(6) deposition.  As one court recently explained:

> The designee's role is to provide the entity's interpretation of events and documents. *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996).  It is not expected that the designee have personal knowledge as to all relevant facts; however, the designee must become educated and gain the requested knowledge to the extent reasonably available. *Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda*, 390 F. Supp. 2d 479, 487 (D.Md. 2005) (recognizing that a Rule 30(b)(6) deposition represents the entity's knowledge and not that of the individual deponent). The designee may become educated by reasonably obtaining information from documents, past employees, or other sources. *Great Am. Ins. Co. of N.Y. v. Vegas Constr. Co., Inc.*, 251 F.R.D. 534, 541 (D. Nev. 2008).  *See also United States v. Mass. Indus. Fin. Agency*, 162 F.R.D. 410, 412 (D. Mass. 1995) (rejecting corporation's arguments that it was not required under Rule 30(b)(6) to educate its witness about actions taken by former employees of the corporation).  A party producing a Rule 30(b)(6) witness "must prepare deponents by having them review prior fact witness deposition testimony as well as documents and deposition exhibits." *Taylor*, 166 F.R.D. at 362.

> Moreover, the Federal Rules of Civil Procedure do not permit a party served with a Rule 30(b)(6) deposition notice or subpoena request "to elect to supply the answers in a written response to an interrogatory" in response to a Rule 30(b)(6) deposition notice or subpoena request. *Marker v. Union Fidelity Life Insurance*, 125 F.R.D. 121, 126 (M.D.N.C. 1989).  "Because of its nature, the deposition process provides a means to obtain more complete information and is, therefore, favored." *Id.* Similarly, in responding to a Rule 30(b)(6) notice or subpoena, a corporation may not take the position that its documents state the company's position. *In re: Vitamins Antitrust Litigation*, 216 F.R.D. at 172, 174.  "Corporations are not entitled to declare themselves mere document-gatherers." *Wilson v. Lakner*, 228 F.R.D. 524, 530 (D.Md. 2005).  "In order to meet the purpose of the Rule, '[i]f a corporation has knowledge or a position as to a set of alleged facts or an area of inquiry, it is its officers, employees, agents or others who must present the position, give reasons for the position, and, more importantly, stand subject to cross-examination.'" *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 2009 WL 3809815 *3 (Nov. 10, 2009 N.D. Cal.) (citing *Taylor*, 166 F.R.D. at 362).

---

[4] LP's 19 depositions topics are set forth in Exhibit A to the parties' joint letter.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

*Kelly v. Provident Life and Accident Ins. Co.*, Civil No. 04cv807-AJB (BGS), 2011 WL 2448276, at *2-3 (S.D. Cal. June 20, 2011).

The testimony of an individual, then, is distinct from the testimony of an entity. *See Sabre v. First Dominion Capital, LLC*, No. 01-0214, 2001 WL 1590544, at *1 (S.D.N.Y. Dec. 12, 2001) ("A deposition pursuant to Rule 30(b)(6) is substantially different from a witness's deposition as an individual. A 30(b)(6) witness testifies as a representative of the entity, his answers bind the entity and he is responsible for providing all the relevant information known or reasonably available to the entity."). Accordingly, and with good reason, courts have rejected the argument that a Rule 30(b)(6) deposition is unnecessary or cumulative simply because individual deponents—usually former or current employees of the entity whose Rule 30(b)(6) deposition is sought—have already testified about the topics noticed in the Rule 30(b)(6) deposition notice. *See Kelly*, 2011 WL 2448276, at *4 (". . . Plaintiff is entitled to the knowledge of the corporation and the corporation's positions on matters clearly relevant and discoverable in this phase of the case. Therefore, any testimony provided by employees as individuals does not satisfy the need for Plaintiff to obtain binding testimony from the corporate entity."); *Mitchell Eng'g v. City and County of San Francisco*, No. C 08-04022 SI, 2010 WL 455290, at *1 (N.D. Cal. Feb. 2, 2010) ("Even if the general topics to be addressed at the 30(b)(6) deposition will overlap to some extent, the questions asked and the answers given might not.") (citing *Sabre*, 2001 WL 1590544, at *1); *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2009 WL 2870622, at *2 (E.D. Wis. Sep. 2, 2009) ("Corporate designees are commonly produced, and no doubt some of their testimony may be a re-hash of what's been covered elsewhere, but their testimony is the testimony of the corporation itself, and for that reason alone it may not be duplicative."). To be sure, the court has an obligation to prevent a party from using a Rule 30(b)(6) deposition to harass the opposing party or to subject the opposing party to unreasonably burdensome or cumulative discovery, Fed. R. Civ. P. 26(b)(2)(C), but here there is no evidence that LP is unnecessarily seeking to depose DBSI, and the court does not believe that the deposition topics are unreasonably duplicative or cumulative of the discovery or testimony already provided. *See UniRAM*, 2007 WL 915225, at *2 (noting that the real question "is not whether topic 1 is duplicative of the June 2006 deposition, but whether topic 1 is *unreasonably* duplicative")

(emphasis in original).

Second, DBSI argues that the "extraordinarily broad topics . . . are ill suited to deposition testimony beyond that of the percipient witnesses" already deposed and that interrogatories are more efficient and less burdensome vehicles for getting the desired discovery.  DBSI cites numerous cases where district courts have limited or quashed Rule 30(b)(6) depositions in patent cases, but these cases are distinguishable.  Some of the cases involved egregious numbers of deposition topics that would have been impossible to prepare for, but DBSI neither argues that preparing a witness would be unreasonably difficult, nor does the court believe that the 19 topics are so broad as to make such an argument persuasive.  *See Apple, Inc. v. Samsung Elec. Co., Ltd.*, 2012 WL 1511901 (N.D. Cal. Jan 27, 2012) (court found Samsung's 229-topic notice to be "facially excessive" and to impose an "impracticable demand" upon Apple); *Krasney v. Nationwide Mut. Ins. Co.*, No. 3:06 CV 1164(JBA), 2007 WL 4365677, at *3 (D. Conn. Dec. 11, 2007) (stating that Plaintiffs' 40 deposition topics are "hardly 'described with reasonable particularity'" and issuing a protective order with respect to several of them).

Other cases involved deposition topics that sought privileged information or the bases for the deponent-party's legal contentions (i.e., information that is particularly suited for so-called "contention interrogatories"[5]), but LP's topics do not appear to call for that kind of testimony (and

---

[5] As Magistrate Judge Brazil once explained:

[T]he phrase 'contention interrogatory' is used imprecisely to refer to many different kinds of questions.  Some people would classify as a contention interrogatory any question that asks another party to indicate what it contends.  Some people would define contention interrogatories as embracing only questions that ask another party whether it makes some specified contention.  Interrogatories of this kind typically would begin with the phrase 'Do you contend that . . . .'  Another kind of question that some people put in the category 'contention interrogatory' asks an opposing party to state all the facts on which it bases some specified contention.  Yet another form of this category of interrogatory asks an opponent to state all the evidence on which it bases some specified contention.  Some contention interrogatories ask the responding party to take a position, and then to explain or defend that position, with respect to how the law applies to facts.  A variation on this theme involves interrogatories that ask parties to spell out the legal basis for, or theory behind, some specified contention.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  DBSI never explicitly argues this, either).  *See Kinetic Concepts, Inc. v. Convatec, Inc.*, 268 F.R.D.

2  255, 260-63 (M.D.N.C. 2010) (recognizing "persuasive authority for the proposition that patent

3  cases do not lend themselves to . . . 'contention' discovery via deposition or an organizational

4  representative" and refusing to allow Plaintiffs to depose Defendants about the "basis for

5  [Defendants'] asserted counterclaims and defenses"); *SmithKline Beecham Corp. v. Apotex Corp.*,

6  No. 99-CV-4304, 2004 WL 739959, at *1-4 (E.D. Pa. Mar. 23, 2004) (declining to require

7  SmithKline's Rule 30(b)(6) deponent to testify about "whether or not SmithKline stands by

8  statements in its patents," "[t]he bases for [SmithKline's] allegations in its complaints filed in these

9  consolidated actions that [Defendant] infringes and will infringe the patents asserted in those

10 complaints," or to answer questions about "[t]he analytical distinctions of Form A over the prior art

11 cited during prosecution of the '423 Form A patent," because to do so would require a non-attorney

12 witness to testify to legal positions); *SmithKline Beecham Corp. v. Apotex Corp.*, No. 98 C 3952,

13 2000 WL 116082, at * 8-10 (N.D. Ill. Jan. 24, 2000) (refusing to require SmithKline's Rule 30(b)(6)

14 deponent to testify about "SmithKline's responses to Defendants' Interrogatories and requests for

15 production," "the factual basis of SmithKline's claim that Defendants infringed the '723 patent," and

16 "SmithKline's investigation and testing activities which led to the conclusion that Defendants were

17 infringing the '723 patent"); *In re Indep. Serv. Orgs. Antitrust Litig.*, 168 F.R.D. 651, 654-55 (D.

18 Kan. 1996) (issuing protective order preventing Plaintiff from discovering "the facts upon which

19 Xerox will rely for its defense and counterclaims" through a Rule 30(b)(6) deposition because it is

20 "overbroad, inefficient, and unreasonable," and "implicates serious privilege concerns, and potential

21 problems with confidential information"); *McCormick-Morgan, Inc. v. Teledyne Indus., Inc.*, 134

22 F.R.D. 275, 285-89 (N.D. Cal. 1991) (issuing protective order prohibiting either party from

23 "pursu[ing] the bases for the other's contentions through 30(b)(6) depositions," but allowing them to

24 do so through "contention interrogatories").  While DBSI might prefer to provide answers to

25 interrogatories than to prepare a witness for a Rule 30(b)(6) deposition, in this context, its preference

26

27 _____

28  *In re Convergent Technologies Securities Litigation*, 108 F.R.D. 328, 332 (N.D. Cal. 1985).

1   does not provide the court with a basis for giving it the relief it seeks. *See Kelly*, 2011 WL 2448276,

2   at *3 ("[T]he Federal Rules of Civil Procedure do not permit a party served with a Rule 30(b)(6)

3   deposition notice or subpoena request 'to elect to supply the answers in a written response to an

4   interrogatory' in response to a Rule 30(b)(6) deposition notice or subpoena request.") (quoting

5   *Marker*, 125 F.R.D. at 126).

6       Accordingly, DBSI's request for an order quashing LP's notice of DBSI's Rule 30(b)(6)

7   deposition is **DENIED**.

8   **B.  The Second Letter: The Parties' Dispute over DBSI's Confidentiality Designations**

9       LP and DBSI entered into a stipulated protective order ("SPO") on March 9, 2012.  SPO, ECF

10  No. 179.  The SPO contains two-tiers of protection: one for "Confidential Information" and one for

11  "Attorney's Eyes Only Information."  *Id.*, ¶¶ 4-5.  Confidential and AEO Information are defined in

12  the SPO as follows:

13      4. Confidential Information: Any Party may designate as "Confidential" all or
        portions of any Material, provided however that no Party may designate as

14      "Confidential" any Material produced by another Party. Such designation shall
        constitute a representation by the Designating Party that he, she or it, in good faith,

15      believes that the Material so designated contains or constitutes at the time of the
        designation: (a) **competitively sensitive or proprietary information**, including

16      information (regardless of how generated, stored or maintained) or tangible things
        that qualify for protection under standards developed under Fed. R. Civ. P. 26(c); (b)

17      **non-public communications with regulators or other governmental bodies** that
        are protected from disclosure by statute or regulation; (c) **non-public business or**

18      **financial strategies, business plans, strategic plans, sales and marketing plans,**
        **marketing surveys, earnings or other financial projections, contracts or**

19      **agreements**, including any documentation that is considered confidential or
        proprietary under other confidentiality or non-disclosure agreements; and/or (d)

20      **information protected by the right of privacy and/or any applicable privilege**,
        including private consumer information (whether of a Non-Party or a Party) that

21      contains identifying, contact or private financial information provided by a consumer
        to a financial institution, resulting from any transaction with the consumer or any

22      service performed for the consumer, or otherwise obtained by the financial
        institution, including any list, description, or other grouping of consumers that is

23      derived using nonpublic personal information.

24      5. Attorney's Eyes Only Information: Any Producing Party may designate as
        "Attorney's Eyes Only" all or portions of any Material, provided however that no

25      Party may designate as "Attorney's Eyes Only" any Material produced by another
        Party. Such designation shall constitute a representation by the Designating Party that

26      he, she or it, in good faith, believes that the Material so designated contains or
        constitutes at the time of the designation: (a) **competitively sensitive or proprietary**

27      **information**, **including** trade secrets, research, analysis, development, **financial or**
        **other commercial information of a non-public nature**, non-public communications

28      with regulators or other governmental bodies that are protected from disclosure by

UNITED STATES DISTRICT COURT
For the Northern District of California

C 09-03529 JSW (LB)
ORDER

statute or regulation; non-public business or financial strategies, business plans, strategic plans, sales and marketing plans, marketing surveys, earnings or other financial projections, contracts or agreements, including any documentation that is considered confidential or proprietary under other confidentiality or non-disclosure agreements and/or information protected by the right of privacy and/or any applicable privilege; *and* (b) **the disclosure of such document or information to another Party or Non-Party, would create a substantial risk of serious harm or injury that could not be avoided by a less restrictive designation**. Materials designated as "Attorney's Eyes Only" may not be used for any business or commercial purpose or any purpose unrelated to the prosecution or defense of this litigation.

*Id.* (emphasis added). Both parties' outside counsel and in-house counsel (who are providing legal services in connection with this action) may have access to either Confidential or AEO Information. *Id.*, ¶¶ 8(b), 9(b). However, for purposes of this dispute, the important distinction between these two designations is that "[e]ach Party, and any director, officer, employee or agent of a Party requested by that Party or any of its attorneys to work on this action and any Party Witness noticed for deposition or subpoenaed for testimony at trial" may have access to Confidential Information, but not to AEO Information. *Id.*, ¶¶ 8(c), 9(c). In other words, AEO Information may not be shared with any business employee within the receiving party's organization, but Confidential Information may.

DBSI challenges LP's designation of "numerous" documents as AEO Information. To make its case, it offers, by way of example, four "five-to-seven-year-old documents" that relate to, as LP accurately describes, "LP's internal accounting deliberations; account statements and other documents showing LP's financial picture and investment strategy; confirmations and e-mails showing investments LP made or considered, and other internal communications about LP's finances and investment strategies."

"In granting a stipulated protective order, the court delegates to the litigants significant discretion to decide what shall be treated as confidential." *Google, Inc. v. American Blind & Wallpaper Factory, Inc.*, No. 03-cv-5340 JF (RS), 2006 WL 5349265, at *2 (N.D. Cal. Feb. 8, 2006) (citing *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 101 F.R.D. 34, 41 (C.D. Cal. 1984)). Under the SPO and the applicable authority, when a confidentiality designation is challenged, the burden of persuasion rests upon the designating party. SPO, ECF No. 179, ¶ 19 ("The Designating Party bears the burden of persuading the Court that the information is

UNITED STATES DISTRICT COURT
For the Northern District of California

C 09-03529 JSW (LB)
ORDER

UNITED STATES DISTRICT COURT
For the Northern District of California

1    in fact "Confidential" or "Attorneys' Eyes Only" as defined in this Protective Order."); *see Phillips*

2    *v. Gen. Motors Corp.*, 307 F.3d 1206, 1211 (9th Cir. 2002); *Echostar Satellite LLC v. Freetech, Inc.*,

3    No. C 07–6124 JW (RS), 2009 WL 8398697, at *1 (N.D. Cal. Aug. 5, 2009).  But "[a] problem

4    arises if it later appears that the parties have abused their authority to designate documents

5    'Confidential' or that, for some reason, some of the sealed information should not legitimately

6    remain closed to the public."  *In re Petroleum Products*, 101 F.R.D. at 41.  "Under such

7    circumstances, the court must balance the interests of confidentiality with the interests of access to

8    the information. *Google*, 2006 WL 5349265, at *2 (citing *In re Petroleum Products*, 101 F.R.D. at

9    41); *see* Fed. R. Civ. P. 26(c) (providing that a court "may make any order which justice requires to

10   protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense).

11   "The weight to be accorded to each may vary according to the purposes the documents serve in the

12   litigation."  *Google*, 2006 WL 5349265, at *2 (citing *In re Petroleum Products*, 101 F.R.D. at 41).

13          The court finds that LP has met its burden to demonstrate that its designation of the documents is

14   proper.  LP argues that the "information DBSI's business people would gain from virtually

15   unfettered access to LP's financial and investment documents over the last several years would be to

16   DBSI's advantage and to LP's disadvantage, particularly to the extent that LP's documents relating

17   to this transaction could reveal to DBSI LP's strategy and practices in accessing the capital markets

18   and negotiating with banks such as DBSI."  Even though LP and DBSI are not direct competitors

19   and do not operate in the same industry, that does not mean that LP does not have a legitimate

20   interest in keeping its financial and investment documents from a party against whom it very well

21   may be negotiating in the future.  *See Barnes & Noble, Inc. v. LSI Corp.*, No. C 11-02709 EMC

22   (LB), 2012 WL 601806, at *3 (N.D. Cal. Feb. 23, 2012) ("Depending on context, parties may

23   become adversaries in a business negotiation without becoming business competitors.").  Indeed, as

24   LP points out, "DBSI already has participated in a major transaction LP entered into in 2009," and

25   LP notes that "it is likely that LP and DBSI will do business again, either in negotiating credit

26   facilities for LP, in entering into ISDA Agreements, or in other business transactions."  DBSI

27   contends that this is "speculation," but it does not argue that LP is incorrect.

28          Instead, DBSI argues that LP has nothing to fear because the SPO limits disclosure of

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Confidential Information to DBSI employees working on this action[6], and those employees are

2    prohibited from using the Confidential Information for purposes unrelated to this action.  While this

3    is true, SPO, ECF No. 179, ¶¶ 1, 7, 10, it also is true that it is difficult "for the human mind to

4    compartmentalize and selectively suppress information once learned, no matter how

5    well-intentioned the effort may be to do so." *In re Deutsche Bank Trust Co. Americas*, 605 F.3d

6    1373, 1378 (Fed. Cir. 2010); *see Mercexchange, LLC v. eBay, Inc.*, 467 F. Supp. 2d 608, 622-23

7    (E.D. Va. 2006) ("[I]t is often-times impossible for an individual, even with the noblest intentions,

8    to delineate between ideas that they may advance as a result of their own creation, and those

9    influenced by past exposure to confidential information."); *In re Worlds of Wonder Sec. Lit.*, 147

10   F.R.D. 214, 216-17 (N.D. Cal. 1992) (noting that it would be "naïve" to think that expert witnesses

11   who would "most likely" be competitors of the party opposing disclosure would be able to "erase"

12   from their minds the at-issue documents that revealed confidential, internal details of how that party

13   conducts its business).

14       The court also finds that DBSI has not shown a sufficient need for its business employees to see

15   LP's AEO Information.  It states that LP's current designations "will keep DBSI employees in the

16   dark about (1) the information regarding ARS that LP was aware of prior to purchasing the

17   securities at issue in this litigation; and (2) LP's sophistication in the auction rate securities market,

18   as evidenced by its purchases of large volumes of auction rate securities over several years before

19   purchasing the auction rate securities at issue in this case."  But this does not tell the court why

20   DBSI's business employees—as opposed to its outside counsel and in-house attorneys, who do have

21   access to LP's AEO Information—need to see this information.  DBSI only argues that

22

23       [6] DBSI specifically states that "[t]he Protective Order strictly limits DBSI's disclosure of

24   'Confidential' materials to only employees requested by its counsel to work on this case," but this is
     not completely accurate.  What the SPO provides is that "[e]ach Party, and any director, officer,

25   employee or agent of a Party requested by that Party or any of its attorneys to work on this action
     and any Party Witness noticed for deposition or subpoenaed for testimony at trial" may have access

26   to Confidential Information.  SPO, ECF No. 179, ¶ 8(c) (emphasis added).  This language in the
     SPO, then, allows either DBSI's counsel or DBSI to request that any of DBSI's employees work on

27   this case.  Although in practice it may always be DBSI's counsel who requests a DBSI employee to
     work on the case, the SPO does not provide such a limitation.

28

C 09-03529 JSW (LB)
ORDER

14

1    "[k]nowledge of these facts by DBSI's non-legal employees is critical if DBSI's business managers

2    are to be able to participate in decisions regarding the litigation or settlement value of LP's claims,"

3    but this is vague.  DBSI provides the court with no detail about what kinds of "business decisions

4    regarding the litigation" its unspecified "business managers" need to participate in or why DBSI's

5    in-house counsel cannot do this, nor does it explain how the AEO Information is critical to getting a

6    handle on LP's potential damages or the value of its claims.

7        Accordingly, on this record, DBSI's request for an order requiring LP to re-designate certain

8    documents is **DENIED.**

9    **C.  The Third Letter: The Parties' Dispute over the Timing of LP's Responses to DBSI's**

10   **Contention Interrogatories**

11       In mid-July 2012, DBSI served LP with (actual) contention interrogatories that ask LP to

12   identify the factual bases for many of its allegations.  *See* ECF No. 231, Ex. A.  LP objected to

13   responding to them at that time, arguing that to do so was premature.  But now that fact discovery

14   should be nearing its end—it closes on September 14, 2012—DBSI wants LP to provide substantive

15   responses.  DBSI says that LP should respond within 5 calendar days because discovery is closing,

16   but LP says that it should have a bit more time because some discovery is still outstanding.[7]

17       Both parties overstate the law.  LP states that "[t]he law is clear that contention interrogatories

18   are not appropriate when, as here, significant discovery remains outstanding."  It is true that

19   "[c]ourts using their Rule 33(a)(2) discretion generally disfavor contention interrogatories asked

20   before discovery is undertaken."  *In re eBay Seller Antitrust Litigation*, No. C07-1882 JF (RS), 2008

21   WL 5212170, at *1 (N.D. Cal. Dec.11, 2008) (citing *Tennison v. City & County of San Francisco*,

22   226 F.R.D. 615, 618 (N.D. Cal. 2005)).  "In fact, courts tend to deny contention interrogatories filed

23   before substantial discovery has taken place, but grant them if discovery almost complete."  *Id.*

24   (citing *Fischer & Porter Co. v. Tolson*, 143 F.R.D. 93, 95 (E.D. Pa. 1992); *In re Convergent*

25   *Technologies Securities Litigation*, 108 F.R.D. 328, 332-38 (N.D. Cal. 1985)).  But here, while there

26   still is fact discovery outstanding, fact discovery is about one week from closing.  This fact alone

27

28
    _____

        [7] LP does not object to the relevance of the interrogatories, nor does it argue that it should
    not have to respond to them.  It objects only  to the timing of its responses.

UNITED STATES DISTRICT COURT
For the Northern District of California

1  significantly undercuts LP's position.  *See HTC Corp. v. Technology Properties Ltd.*, No. C08-

2  00882 JF (HRL), 2011 WL 97787, at *2 (N.D. Cal. Jan. 12, 2011) (noting that "discovery is in full-

3  swing" and denying defendants' motion to compel supplemental contention interrogatory

4  responses); *In re eBay Seller Antitrust Litigation*, No. C07-1882 JF (RS), 2008 WL 5212170, at *1

5  (case was in the "early stage of discovery," no fact discovery cutoff had yet been set, and much more

6  discovery occurred after the court denied without prejudice defendant's motion to compel early

7  contention interrogatory responses).  Indeed, to adopt LP's statement of the law would create a

8  perverse incentive: If a party did not want to respond to contention interrogatories, it would just

9  conduct all its discovery at the very end of the discovery period and then claim that it cannot

10  respond to the interrogatories because not enough discovery has been done.

11      On the other hand, it is important that sufficient discovery be completed so that responses to

12  contention interrogatories are useful.  To the extent that DBSI suggests that contention

13  interrogatories simply become due when the discovery cutoff is one or two weeks away, the court

14  disagrees.  Each case is different, and the court must also look at what discovery has occurred and

15  what discovery is about to occur and when.  In that regard, DBSI's request for responses within 5

16  calendar days strikes the court as unworkable in this context.  Earlier in this order, the court denied

17  DBSI's request for an order quashing LP's notice of DBSI's Rule 30(b)(6), so this deposition, at

18  least, should be coming up soon, although the court doubts it will be taking place within the next 5

19  days.  This is important because LP states that this deposition (along with the Rule 30(b)(6)

20  deposition of DBSI's parent, Deutsche Bank AG) is particularly important if LP is to answer the

21  contention interrogatories.

22      Given the specific context of this case, the court believes that LP must respond to DBSI's

23  contention interrogatories, and it must do so soon, but it need not do so within 5 calendar days.

24  Instead, the court believes that LP should respond to them within 7 calendar days of DBSI's Rule

25  30(b)(6) deposition.  This provides both sides with an incentive to conduct the discovery at issue in a

26  timely fashion.[8]

27  ───────────

28      [8] Also, the court **DENIES** LP's request to absolve it of its responsibility and continuing duty
to supplement its interrogatory responses should new information require it.  *See* Fed. R. Civ. P.
26(e).

C 09-03529 JSW (LB)
ORDER

UNITED STATES DISTRICT COURT
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

### IV.  CONCLUSION

For the foregoing reasons, the court **DENIES** DBSI's requests for an order quashing LP's notice of DBSI's Rule 30(b)(6) deposition and requiring LP to re-designate certain documents.  The court also **GRANTS** DBSI's request for an order compelling LP to provide responses to DBSI's contention interrogatory answers.  LP shall respond to DBSI's contention interrogatories within 7 calendar days from the date that LP takes DBSI's Rule 30(b)(6) deposition.

**IT IS SO ORDERED.**

Dated: September 10, 2012



_____
LAUREL BEELER
United States Magistrate Judge